FILED
01/29/2018
Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned On Briefs January 3, 2018

## IN RE:  KE'ANDRE C.,[1] ET AL.

### Direct Appeal from the Juvenile Court for Maury County
### No. 2017-JV-4     George L. Lovell, Judge

---

### No. M2017-01361-COA-R3-PT

---

This is a termination of parental rights case concerning two minor children.  Mother is the biological parent of both children.  Father is the biological parent of the younger child only.   The trial court found by clear and convincing evidence that multiple grounds existed to terminate Mother's parental rights to both children and Father's parental rights to his child.   Mother and Father appealed.  We reverse the trial court's finding as to one ground for termination asserted against Mother and one ground asserted against Father, but we otherwise affirm the termination of Mother's and Father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed in part, Affirmed in part and Remanded**

BRANON O. GIBSON, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and RICHARD H. DINKINS, J.J., joined.

Jennifer Lenore Fiola, Columbia, Tennessee, for the appellant, Kendra C.

Shawn David Snyder, Columbia, Tennessee, for the appellant, Anthony H.

Herbert H. Slatery III, Attorney General and Reporter, and Michael Collins Polovich, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

---

[1]In termination of parental rights cases, it is the policy of this Court to redact names in order to protect the identities of the children involved.  In this case, in order to preserve both clarity and the anonymity of the children, we will redact the names of individuals sharing the children's surname and will refer to those individuals by their given name and the first letter of their surname.

# OPINION

## I. Facts & Procedural History

The minor children at issue in this case are Makaila, born in November 2008, and Ke'Andre, born in December 2015 (collectively the "Children"). Kendra C. ("Mother") is the biological mother of both Children. Makaila's biological father is deceased. Anthony H. ("Father") is the biological father of Ke'Andre. Accordingly, the petition at hand relates to the termination of Mother's parental rights to both Children and to Father's parental rights to Ke'Andre only.

Mother has an extensive history of drug abuse and a relationship with the Department of Children's Services ("DCS") dating back nearly a decade. Her first interaction with DCS was in December 2008, which was one month after she gave birth to Makaila. At that time, Child Protective Services received information that Makaila was exposed to environmental neglect and drugs. Over the next few years, DCS was required to intervene on Makaila's behalf on multiple occasions. DCS eventually filed another dependency and neglect petition in 2014 when it learned that Mother, who was incarcerated, left Makaila in the care of a relative (with a known history of drug abuse) who had overdosed. In 2015, DCS filed another petition. Mother was pregnant with Ke'Andre by this time and tested positive for benzodiazepines, marijuana, opiates, and oxycodone. She failed additional drug tests in the months following Ke'Andre's birth. These positive drug tests also served as a basis for Mother to violate her probation, and she was incarcerated again in April 2016 and remained incarcerated throughout the termination proceedings. Both Children were immediately placed in DCS custody and have been together in the same foster home since that time.

Father, the biological parent of Ke'Andre, has his own lengthy track record with the criminal justice system. Although Father testified that he and Mother were not in a monogamous relationship when Ke'Andre was conceived, Father was present for the birth of the child because he believed there was a 50/50 chance the child was his. During the pendency of the termination proceedings, Father wrote a letter to a DCS representative stating: "I was there when Ke'Andre was born and I want to continue to be there." Father's paternity was eventually established by DNA testing on June 21, 2016. Throughout Mother's pregnancy and Ke'Andre's life, Father has been incarcerated for violations of probation, tested positive for illegal drugs, and has established no relationship whatsoever with the child.

On April 20, 2016, DCS filed the current petition to terminate parental rights against Mother and Father. As grounds for termination, DCS alleged that Mother's conduct constituted the following grounds for termination of her parental rights: (1) abandonment by an incarcerated parent, (2) abandonment for failure to provide a suitable

home, (3) substantial noncompliance with the permanency plan, and (4) failure to assume legal and physical custody. Regarding Ke'Andre, DCS alleged that Father's rights should be terminated due to (1) abandonment by an incarcerated parent, (2) substantial noncompliance with the permanency plan, and (3) failure to assume legal and physical custody. The trial was held on May 24, 2017. The court heard testimony from Mother, Father, the DCS representative, and the court appointed special advocate for the Children, as well as arguments of counsel for all parties. Twenty-eight exhibits were entered into evidence. At the conclusion of the trial, the court determined that DCS had proven all grounds alleged against Mother and Father, and that terminating their parental rights was in the best interest of the Children. A written order terminating parental rights was subsequently entered by the court on June 20, 2017.

## II. Issues Presented

Mother presents the following issues, as slightly reworded, for review:

1.      Whether the trial court erred in finding that the Department of Children's Services made a reasonable effort to provide services to Mother to substantially comply with the permanency plan?

2.      Whether the trial court erred in determining that termination of Mother's parental rights is in the best interest of the children?

Father presents the following issues, as slightly reworded, for review:

3.      Whether the trial court erred in determining that Father abandoned his child, pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(iv), by engaging in conduct that exhibited a wanton disregard for the health, safety, and welfare of the child?

4.      Whether the trial court erred in determining that termination of Father's parental rights is in the best interest of the child?

## III. Standard of Review

"In Tennessee, proceedings to terminate a parent's parental rights are governed by statute." *In re Kaliyah S.*, 455 S.W.3d 533, 541 (Tenn. 2015). Tennessee Code Annotated section 36-1-113 sets forth the grounds and procedures for terminating the parental rights of a biological parent. *Id.* at 546. Pursuant to the statute, parties who have standing to seek termination of a biological parent's parental rights must prove two elements. *Id.* at 552. First, they must prove the existence of at least one of the statutory

3

grounds for termination listed in Tennessee Code Annotated section 36-1-113. *Id.* Second, the petitioner must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i). *Id.* In light of the constitutional dimension of the rights at stake in a termination proceeding, the persons seeking to terminate parental rights must prove both of these elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). "Clear and convincing evidence" has been defined as "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) (citing *In re Valentine*, 79 S.W.3d at 546). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

In sum, in order to terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Adoption of Angela E.*, 402 S.W.3d at 639. Because of this heightened burden of proof in parental termination cases, on appeal we must adapt our customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). First, we review each of the trial court's specific factual findings *de novo* in accordance with Rule 13(d), presuming the finding to be correct unless the evidence preponderates against it. *In re Adoption of Angela E.*, 402 S.W.3d at 639. Second, we must make our own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016) (citing *In re Bernard T.*, 319 S.W.3d at 596-97)). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. Discussion

The trial court relied on the following statutory grounds to terminate Mother's parental rights: (1) abandonment by an incarcerated parent, (2) abandonment for failure to provide a suitable home, (3) substantial noncompliance with the permanency plan, (4) failure to assume legal and physical custody. The trial court relied on the same statutory grounds to terminate Father's rights with the exception of failure to provide a suitable home. Mother and Father do not attempt to defend against each ground for termination

4

of their parental rights found by the trial court. Mother's sole issue raised on appeal related to grounds for termination concerns the efforts made by DCS to enable her to comply with her permanency plan, and Father's sole issue related to grounds is whether he exhibited a wanton disregard for the welfare of his child. Although only one ground must be proven by clear and convincing evidence in order to terminate parental rights, due to the of the fundamental nature of the parental rights at stake in termination cases, the Tennessee Supreme Court has instructed that "in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26. We will, therefore, review each ground for termination relied upon by the trial court.

### A. Grounds for Termination

### 1. Abandonment by an Incarcerated Parent – Mother

The trial court found that Mother engaged in conduct that constitutes abandonment of the Children by an incarcerated parent pursuant to Tennessee Code Annotated sections 36-1-113(g)(1) and 36-1-102(1)(A)(iv).

> For purposes of terminating the parental or guardian rights of a parent or parents . . . "abandonment" means that:
>
> . . . .
>
> (iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either had willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration which exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv). The trial court found that Mother had been in jail for part or all of the four (4) months preceding the filing of those proceedings based on the following evidence introduced at trial:

5

(a) [Mother] had been convicted of False Report and Conspiracy to False Report by the Circuit Criminal Court for Maury County, Tennessee,

(b) [Mother] had been sentenced to serve a term of incarceration of four years,

(c) [Mother's] sentence was suspended and she was placed on probation,

(d) [Mother] violated the terms of her probation,

(e) [Mother] was ordered to report to jail on July 26, 2016 to serve the remainder of her sentence, and

(f) [Mother] has been continuously incarcerated since July 26, 2016.

As noted above, the definition of abandonment for incarcerated parents provides that abandonment occurs when the parent "engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." Tenn. Code Ann. § 36-1-102(1)(A)(iv). This definition "reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866. Incarceration severely compromises a parent's ability to perform parental duties, and a parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child. *Id.* However, incarceration is not an infallible predictor of parental unfitness. *Id.* Rather, "incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.* The issue is whether the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child. *Id.*

To that end, the trial court further found that the following conduct amounted to Mother's "wanton disregard for the health, safety and welfare" of the Children by clear and convincing evidence:

(a) On June 5, 2014, Petitioner DCS filed a Petition for Temporary Legal Custody regarding the minor child, Makaila [ ]. At that time, [Mother] was incarcerated in the Maury County jail serving an eighty (80) day sentence. [Mother] was convicted of False Report and Conspiracy to File a False Report and sentenced to serve 4 years of incarceration, but placed on supervised visitation and released on June 26, 2014.

6

(b) On June 29, 2015, Petitioner DCS filed a Petition for an Order Controlling Conduct. The petition asserted grounds of Lack of Supervision and [Mother's] refusal to submit to a random drug screen and cooperate with the Child Protective Services investigation. On July 31, 2015, an Order was entered that required [Mother] to cooperate with the Child Protective Services investigation, including submitting to a hair follicle drug screen by July 17, 2015. On September 1, 2015, [Mother] stipulated to a finding by clear and convincing evidence that the minor child, Makaila [ ], was dependent and neglected due to "failed drug screens."

(c) On September 2, 2016, [Mother] tested positive for the presence of benzodiazepines, marijuana, opiates and oxycodone.

(d) On April 14, 2016, a Violation of Probation was filed by [Mother's] probation officer alleging that "On or about 3/24/2016, [Mother] appeared before the administrative case review committee (ACRC). [Mother] was referred to [the] ACRC in reference to multiple failed drug screens. [Mother] was instructed to complete substance abuse treatment. [Mother] failed to enter or complete treatment as instructed." The probation officer also noted that [Mother] has violated the terms of her probation because, "On or about 2/1/[2016] [Mother] was drug screened and tested positive for Benzodiazepines (no valid prescription) and marijuana. On or about 2/4/2016 positive results were confirmed by Alere Toxicology Services. On or about 2/8/2016, [Mother] was drug screened and tested positive for Benzodiazepines (no valid prescription) and marijuana. On or about 2/11/2016 positive results were confirmed by Alere Toxicology Services. On or about 3/7/2016, [Mother] was drug screened and tested positive for Benzodiazepines, marijuana (no valid prescription). On or about 3/10/2016 positive results were confirmed by Alere Toxicology Services."

(e) As a result of violating her Probation, a Revocation Order was entered on July 21, 2016 that compelled [Mother] to serve out the remainder of her four-year sentence, beginning on Tuesday, July 26, 2016. [Mother] remains incarcerated as of the time of the hearing on the Petition to Terminate Parental Rights.

(f) On April 20, 2016, Petitioner DCS filed a Petition to Adjudicate Dependency and Neglect as to both Children. At that time, [Mother] had admitted to using and abusing cocaine, benzodiazepines and opiates while pregnant with the minor child, Ke'Andre [ ]. Moreover, [Mother] had not completed [a]lcohol and drug treatment and was incarcerated for violating

7

the terms of her probation. [Mother] was drug screened on April 20, 2016 and she was positive for the presence of marijuana.

(g) On June 8, 2016, [Mother] was drug screened and tested positive for the presence of cocaine, benzodiazepines, marijuana and benzoylecgonine.

(h) On July 12, 2016, [Mother] was drug screened and tested positive for the presence of cocaine and marijuana.

The trial court also noted that the criteria and procedures for terminating parental rights had been reviewed with Mother in June 2014, which made her aware of the consequences of her actions.

A parent's "poor judgment and bad acts that affect the children constitute a wanton disregard for the welfare of the children." *State, Dep't of Children's Servs. v. Hood*, 338 S.W.3d 917, 926 (Tenn. Ct. App. 2009) (citing *State v. Harville*, No. E2008-00475-COA-R3-PT, 2009 WL 961782, *7 (Tenn. Ct. App. Apr. 9, 2009)). For example, "[w]e have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of the child." *In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005). These behaviors do not have to have occurred within a specific time period, and a court may look beyond the four (4) months immediately preceding the parent's incarceration. *Id.* Mother's history of poor judgment and bad acts affecting her Children is lengthy and dates back to the month after Makaila's birth. Unfortunately, Mother has not been willing or able to stay drug-free and out of jail in a way that would allow her to perform basic parenting duties for these Children. When Mother was out of jail, her Children were at times being cared for by drug-using relatives, friends of friends, or in the custody of DCS. We affirm the trial court's finding that Mother's conduct constitutes abandonment of the Children by exhibiting a wanton disregard for their health, safety, and welfare.

## 2. **Abandonment by an Incarcerated Parent – Father**

The trial court held that Father abandoned Ke'Andre by exhibiting a wanton disregard for his welfare in the following way:

(a) On June 8, 2015, [Father] was placed on two years' probation for Attempted Tampering with evidence and Simple Possession. On June 23, 2015, [Father] pled guilty to one count of Promotion of Prostitution in Rutherford County Circuit Court and was sentenced to 3 years supervised probation and was required to register as a sex offender.

(b)  On June 7, 2016, a Violation of Probation was filed against [Father] stating that he had failed two drug screens for marijuana on March 2, 2016 and April 18, 2016 and was arrested on June 8, 2016 in Maury County, Tennessee.

(c)  On June 8, 2016, [Father] pled guilty to Attempted Tampering with Evidence, a Class D Felony, and Simple Possession of Marijuana, a class A Misdemeanor.  He was sentenced to serve two years, which was suspended to probation and ran concurrently.

(d)  On August 9, 2016, a Violation of Probation [was] filed against [Father] in Rutherford County, Tennessee and he was arrested August 9, 2016.

(e)  On September 16, 2016, [Father's] probation was revoked and [Father] was ordered to serve 3 years in jail.  [Father] entered a plea of guilty to one count of Promoting Prostitution in Rutherford County, Tennessee and he was required to register as a sex offender as part of his sentence.

Father argues that the trial court erred in holding that the conduct above constitutes wanton disregard of Ke'Andre because he was not actually legitimated as the child's Father until June 21, 2016, and, therefore, his actions before that date should not be used against him.   In support of his position, Father points to our decision in *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244 (Tenn. Ct. App. June 9, 2015), in which case the father had no specific knowledge that his child's mother was even pregnant and only learned after the child's birth that the child existed.  In that case, we held that a person "cannot disregard . . . someone whom he does not know exists."  *Id.* However, the facts of *In re Anthony R.* are easily distinguishable from the case at bar because Father *was aware* of Ke'Andre's existence.  Father was physically present for the birth of Ke'Andre because he believed there was at least a fifty percent chance that the child was his.  And it was not until after Ke'Andre was born that Father engaged in the conduct that resulted in the revocation of his probation.  We reject Father's attempt to now claim ignorance and rely on the fact that he failed to take steps to legitimate his child until required to do so by a court.

The trial court specifically found that Father "knew on or before [Ke'Andre's date of birth] that he may be the father of the minor child."  We conclude that the evidence does not preponderate against the trial court's factual findings on this issue, and that Father's patterns of criminal behavior, illegal drug use, and incarceration, along with his failure to take any voluntary actions to legitimate or otherwise support the child, amount

9

to a wanton disregard for the welfare of Ke'Andre. This ground for termination has been established by clear and convincing evidence.

### 3. Abandonment for Failure to Provide a Suitable Home – Mother re: Makaila

The trial court held that DCS also carried its burden of proof with regard to Mother's abandonment of Makaila for failure to provide a suitable home pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(ii). However, DCS does not defend this ground for termination on appeal, conceding that the "record does not illuminate whether the children's latest removal into state custody resulted in a final dependency-and-neglect adjudication." We agree. Accordingly, we reverse the trial court's determination that Mother abandoned Makaila by failing to provide a suitable home.

### 4. Substantial Noncompliance with Permanency Plans – Mother

A court may terminate a parent's parental rights when the parent is in "substantial noncompliance . . . with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). In terminating parental rights under this ground, the court "must first find that the plan requirements are reasonable and related to conditions that necessitate foster care placement." *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *10 (Tenn. Ct. App. June 10, 2014). "The trial court must then find that the noncompliance is substantial." *Id.* (citation omitted). Although the termination statute does not define what conduct constitutes substantial noncompliance, the significance of the noncompliance "should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. Because determining whether substantial noncompliance exists is a question of law, we review the issue de novo with no presumption of correctness. *Id.* at 548.

Permanency plans were created in this case that each contained substantially the same actions steps for Mother to complete. These requirements of Mother's permanency plans were reasonably related to remedying the reason that the Children were initially removed from the home, which stemmed from mother's illegal drug use and inability to stay out of jail in order to properly care for her Children.

The trial court made the following findings with respect to Mother's noncompliance with permanency plans:

> (a) The initial permanency plan listed a number of requirements that [Mother] needed to satisfy before the children could be safely returned to her. The plan gave her until November 1, 2016 to satisfy the requirements.

10

(b)  The plan required [Mother] to: (a) participate in an intake at Bradford Health Services for intensive outpatient treatment and with Centerstone for individual counsel[ing] and to follow recommendations of the service providers and sign releases, (b) attend AA/NA meetings (a minimum of 4 meetings per week) and keep proof of attendance, (c) submit to and pass random drug tests, including hair follicle, swab tests, and urine tests, (d) maintain her current housing, (e) provide proof of job applications and proof of income once employed, (f) develop a transportation plan, (g) avoid associating with anyone involved in illegal drug use, (h) utilize caregivers and live with individuals who can pass random drug screens and background checks, (i) follow the rules of probation and not incur any new charges, (j) attend prenatal appointments, [(k)] develop a healthy support system, and [(l)] make a list of items needed for her upcoming delivery.

(c)  [Mother] participated in the development of the initial permanency plan by telephone and attended court for the plan's ratification on June 13, 2016. Although [Mother] left prior to the court hearing her case, the Department explained the requirements and responsibilities to [Mother] and she previously agreed to the provisions of the plan.

(d)  The initial permanency plan was revised on September 2, 2016.  The revised plan reiterated the requirements of the initial plan in regard to [Mother].  The revised plan gave [Mother] until November 11, 2016 to complete the plan requirements.

(e)  The Court finds by clear and convincing evidence that [Mother] failed to substantially comply with the requirements of the permanency plans in that: (1) [Mother] participated in the initial intake with Bradford [H]ealth Services, but she failed to complete her alcohol and drug treatment or the individual counseling through Centerstone.  Moreover, [Mother] was ordered by the Circuit Criminal Court for Maury County, Tennessee, to attend drug treatment and her failure to do so was one of the factors that led to the revocation of her probation and her current incarceration, (2) [Mother] failed to provide proof of her attendance at AA/NA meetings, (3) [Mother] routinely and repeatedly failed random drug screens.  According to criminal court records, [Mother] failed drug screens administered by her probation officer, which was one of the factors that led to the revocation of her probation and current incarceration, (4) [Mother] failed to maintain housing in that she violated the terms of her probation and was ordered to serve the remainder of her 3-year sentence in jail, (5) [Mother] failed to provide proof that she applied for employment and [f]ailed to provide proof

11

of income, (6) [Mother] failed to develop a transportation plan or did not obtain a valid driver's license, (7) [Mother] continued to associate with individuals involved in illegal drug use. Specifically, [Mother] continued to associate and reside with [Father], who repeatedly tested positive for the presence of marijuana when drug screened by his probation officer, (8) [Mother] continued to reside with individuals who were unable to pass drug screens or background checks. Specifically, [Mother] continued to associate and reside with [Father], a registered sex offender, who repeatedly failed random drug screens administered by his probation officer for the presence of marijuana, [(9)] [Mother] failed to attend grief and loss counseling at Centerstone, and [(10)] [Mother] did not develop a healthy support system. Instead, she continued to associate with individuals who used and abused drugs and engaged in criminal activity. In particular, [Mother] continued to associate and reside with [Father], who had been convicted of Promotion of Prostitution, Attempted Tampering with Evidence and Simple Possession of Marijuana.

With the exception of the finding that Mother lived with Father, our review of the record supports the trial court's findings regarding Mother's permanency plans and failure to comply with them. On appeal, Mother asserts that the trial court erred in finding that DCS made reasonable efforts to assist her in complying with the requirements of her permanency plan. With regard to the efforts made by DCS to assist Mother, the trial court found that the following services provided or referred to Mother by DCS constituted sufficient "reasonable efforts":

(a) random drug screens, (b) therapeutic visitation services with parenting assistance, (c) alcohol and drug treatment counseling, (d) case management services, (e) individual counseling, (f) grief and loss counseling, (g) []transportation to and from services and visits with the children, (h) daily care and support for the children, (i) medical and dental care for the children, (j) development of permanency plans for reunification of the children with the parents, and (k) ongoing advice and recommendations to [Mother and Father] regarding how to resolve barriers to reunification and access to services.

In addition to the foregoing, DCS attempted on more than one occasion to verify Mother's housing situation, but Mother was either not home or failed to show up for a scheduled visit. Regarding Mother's treatment programs, DCS provided Mother with the contact information for one treatment program and spoke directly with the other facility to set up Mother's referral. DCS also provided Mother with a list of employers who hired felons. We find no merit in Mother's assertion that the state failed to make

reasonable efforts to assist her in complying with the requirements of her permanency plan. The record supports the trial court's findings on this ground, and we conclude that those findings constitute Mother's substantial noncompliance with permanency plans pursuant to Tennessee Code Annotated section 36-1-113(g)(2).

## 5.     **Substantial Noncompliance with Permanency Plan – Father**

The trial court also held that Father was not in substantial compliance with his respective permanency plans based on the following findings:

(f)  The initial permanency plan required [Father] to complete the following requirements: (a) participate in DNA testing regarding the paternity of the minor child, Ke'Andre [ ], and (b) once legitimated, participate in permanency planning.

(g)  [Father] was legitimated as the father of the minor child, Ke'Andre [ ], on or about June 21, 2016 and the initial permanency plan was revised on September 2, 2016 to add the following requirements to be completed by [Father]: (1) obtain a legal source of income and provide proof to the Department, (2) pay child support and provide basic supplies for the child, (3) maintain employment for four months to show stability, (4) not incur any new charges and follow the rules of probation, (5) obtain stable housing, (6) submit to and pass random drug screens, (7) submit a list of needed household items to the Department, if needed, (8) provide a copy of the lease or rental agreement to the Department along with proof of paid utilities and maintain the same for four months, and (9) maintain a home free from illegal activities.

(h)  At the time the plan was ratified on September 12, 2016, [Father] was unable to be present because he had been arrested on August 9, 2016 for Violation of Probation in Rutherford County, Tennessee. On September 16, 2016, [Father's] probation was revoked and he was ordered to serve the remainder of a three year sentence in jail.

. . . .

(k)  The Court finds by clear and convincing evidence that [Father] failed to substantially comply with the requirements of the permanency plan in that: (1) [Father] did not maintain employment due to incarceration, (2) [Father] failed to follow the rules of probation resulting in his current incarceration, (3) [Father] failed to maintain suitable housing due to his current

13

incarceration, and (4) [Father] failed to maintain a home free from illegal activities.

While Father does not dispute this ground for termination on appeal, we are not convinced that the facts support its application to Father's case. The portions of Father's permanency plan with which he did not comply were created for him after his incarceration, at which time it was all but impossible for Father to comply. The trial court even noted that Father's inability to maintain suitable housing and maintain employment were because he was already incarcerated at the time these requirements were put into place.

DCS defends the trial court's finding that Father is guilty of substantial noncompliance with his permanency plan based on case law that stands for the proposition that incarceration does not relieve a parent of their responsibilities to their children. *See In re Aiden R.,* No. E2015-01799-COA-R3-PT, 2016 WL 3564313, at *9 (Tenn. Ct. App. June 23, 2016) (*no perm. app. filed*). We do not dispute this general statement of the law. However, in the case at bar, incarceration was a complete barrier to Father's success under his permanency plan. This Court has addressed a similar situation and explained the predicament as follows:

> We next address whether the Juvenile Court erred in finding that Father failed to substantially fulfill the requirements of his permanency plan. Again, Father's context must be understood. An incarcerated parent is not absolved of his or her parental responsibilities while in jail or prison. However, incarceration is a relevant consideration when judging that parent's ability to fulfill his or her responsibilities to the child. Among other things, Father completed an alcohol and drug assessment and was in the process of resolving his legal charges. In our judgment, Father did much of what he reasonably could be expected to do under his conditions, and the evidence is not clear and convincing that he failed to comply with his permanency plan in a substantial way.

> We are aware of this Court's opinion of *In Re: Kason C., et al.,* No. M2013-02624-COA-R3-PT, 2014 WL 2768003 (Tenn. Ct. App. June 17, 2014), *no perm. app.* [ ] *filed*, in which this Court found that there was clear and convincing evidence to support the Juvenile Court's finding that the father had failed to substantially comply with the reasonable parenting responsibilities set out in the parenting plans, at least in part, because of the father's incarceration. This Court in *In Re: Kason C.* correctly noted that a parent's substantial noncompliance with a permanency plan is not required to be willful to justify termination of that parent's parental rights

14

on that ground. We, however, believe that caution by the courts is appropriate here to avoid making incarceration solely on its own into a de facto ground for termination. Clearly in most situations an incarcerated parent is going to be unable to complete at least some significant portion of the permanency plan. Our General Assembly, however, has not deemed it appropriate to make incarceration solely by itself a ground for termination. This being so, we are concerned that a blanket holding that a parent who is unable to complete a permanency plan solely because of his incarceration may, in effect, have his parental rights terminated not because of failure to substantially comply with the permanency plan but, in reality, because of his incarceration. We vacate this ground.

*In re Jonathan F.,* No. E2014-01181-COA-R3-PT, 2015 WL 739638, at \*13 (Tenn. Ct. App. Feb. 20, 2015).

Much like the case of *In re Jonathan F.*, we believe that terminating Father's parental rights in this case on the ground of substantial noncompliance with his permanency plan would be tantamount to terminating his parental rights solely based on his incarceration. Although Father's incarceration is a serious variable to be considered in the context of several of the grounds alleged for the termination of his parental rights, it cannot stand alone as a de facto bar to Father's right to parent. We therefore reverse the trial court's finding of Father's substantial noncompliance with a permanency plan as a ground for termination of his parental rights to Ke'Andre.

### 6.    Failure to Assume Legal and Physical Custody – Mother and Father

Tennessee Code Annotated section 36-1-113(g)(14) provides that parental rights may be terminated when:

> A legal parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). The trial court held that Mother and Father failed to manifest an ability and willingness to assume legal and physical custody of the Children based on the following findings:

> 21. Based upon the criminal court documents pertaining to [Mother and Father], the testimony of [Mother and Father] and FSW Staggs, the Court finds by clear and convincing evidence that [Mother and Father] are both

15

currently incarcerated and serving the remainder of multiple-year sentences for previous convictions.

22. As repeatedly outlined here, [Mother and Father] both have a history of drug use and abuse and have not participated in any drug treatment or counseling. The criminal court records pertaining to [Mother and Father] clearly show that they were positive for the pretense of illegal drugs when drug screened by their respective probation officers. Moreover, FSW Staggs and the Dependency and Neglect records involving these parties indicate that [Mother] routinely and regularly tested positive for the presence of various illegal substances when she was drug screened by DCS Representatives. FSW Staggs testified that both [Mother and Father] were offered drug and alcohol treatment and counseling, but that both [ ] failed to avail themselves of those services. Moreover, the criminal court records indicate that [Mother] was ordered by the Circuit Criminal Court for Maury County, Tennessee, to attend in-patient drug treatment, but [Mother] [f]ailed to complete the treatment.

23. Based upon the court records of the Dependency and Neglect matters involving these parties and the testimony of FSW Staggs[,] Petitioner DCS has been involved with [Mother] on numerous occasions from 2014 to present and [Mother] was offered or provided with therapy, treatment and counseling to address her drug use and abuse issues, yet [Mother] failed to complete or participate in those services.

24. Based upon the testimony of FSW Staggs, [Father] was offered or provided with therapy, treatment and counseling services to address his drug use and abuse issues after he was determined by DNA testing to be the biological father of the child, [K]e'Andre [ ]. However, [Father] failed to participate in these services because he was charged with Violation of Probation and ordered to serve a multiple year term of incarceration.

25. As a result of the foregoing, the Court finds by clear and convincing evidence that [Mother and Father] have failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the children and placing the children in the legal and physical custody of [Mother and Father] would pose a risk of substantial harm to the physical or psychological welfare of the children.

Neither Mother nor Father challenge this ground on appeal. At the time of trial, there was no dispute that Mother and Father were both incarcerated and lacked the ability to assume custody of the Children. Furthermore, each parent knowingly engaged in

repeated criminal conduct that necessitated their re-incarceration and would put the Children at physical and/or psychological risk if placed in their custody. The record does not preponderate against the trial court's findings on this ground, and we conclude that DCS has proven by clear and convincing evidence that Mother and Father failed to manifest an ability and willingness to assume legal and physical custody or financial responsibility of the Children.

## *B. Best Interest of the Children*

Because the trial court properly found the existence of multiple statutory grounds for termination of Mother's and Father's parental rights to the Children, we now consider the chancery court's finding that terminating Father's parental rights is in the best interest of the Child. Tennessee Code Annotated section 36-1-113(i) sets forth a list of factors that are relevant in a best-interest analysis. However, this list of factors is not exhaustive, and a court need not find the existence of every factor for termination. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). This Court has also noted that the best interests "of a child must be determined from the child's perspective and not the parents." *In re Arteria H.*, 326 S.W.3d 167, 182 (Tenn. Ct. App. 2010) (citing *White v. Moody,* 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

Mother and Father both argue that termination of their parental rights is not in the best interest of the Children. In finding that termination was in Children's best interest, the trial court stated as follows:

> Based upon the criminal court records pertaining to both [Mother and Father], the court records pertaining to the underlying dependency and neglect matters, the testimony of FSW Staggs [DCS representative], and the children's foster care mother, the Court finds by clear and convincing evidence that it is in the best interest of the children for termination to be granted because:
>
> (a) [Mother and Father] have not made changes to their conduct or circumstances that would make it safe for the children to go home. [Mother] has long-standing issues with illegal and prescription drug use and abuse and has failed to complete drug treatment and counseling. As result, [Mother] has been found guilty of violating the terms of her probation and she is serving a 4-year term of incarceration in jail. The same is true for [Father]. He repeatedly failed drug screens for the presence of marijuana in his system and attempted to tamper with his GPS device, which resulted in the revocation of his probation and he is serving the remainder of a three [year] term of incarceration.

17

(b)  [Mother and Father] have not made lasting changes in their lifestyle or conduct after reasonable efforts by the state to help, so that lasting change does not appear possible.  [Mother] has been offered or referred drug treatment and counseling on several different occasions, which she repeatedly failed to complete.  [Mother] failed numerous drug screens for the presence of a variety of different drugs in her system, including, but not limited to, marijuana, cocaine, benzodiazepines, opiates and oxycodone.

Since being legitimated, the minor child, Ke'Andre [ ], is at risk of harm from [Father] due [to] his criminal activities and drug use and abuse.  [Father] has been convicted of criminal offenses, including, [but] not limited to, Promotion of Prostitution, Tampering with Evidence, and Simple Possession of Marijuana.  He violated the terms of his probation for, [among] other reasons, failing several drug screens for the presence of marijuana in his system.

(c)  There is no meaningful relationship between Ke'Andre [ ] and [Father], who has been incarcerated for the majority of the time the child has been in DCS custody.

(d)  Changing caregivers at this stage in the lives of these children would have detrimental effects on them.  These children have been in the home of their current foster parents since they were placed into DCS custody in April of 2016.  The children refer to their foster care parents as "mom" and "dad" and have bonded with them.  To change caregivers after such a long period of time would be disruptive to the children and destabilize their lives.

(e)  There is crime in the homes of [Mother and Father].  As stated earlier, both [Mother and Father] have a history of engaging in criminal activity and drug use and abuse.  Both [Mother and Father] are currently serving lengthy sentences in jail as a result of violating the terms of their probation by engaging in additional criminal activity and illegal drug use and abuse while on probation.

(f)  As outlined above, [Mother and Father] both use and abuse drugs, rendering them consistently unable to care for the children in a safe and stable manner.

Mother alleges that the trial court erred in its best interest analysis because, in general, she does have a bond with her Children and that many of the lifestyle changes she has been unable to make have been the result of the state's failure to assist her in doing so. The trial court made no finding that Mother did not have a bond with her Children, but the fact remains that she has been gone from their lives for such a substantial period of time that the Children have now also bonded with their foster family. Further, the bond between Mother and her Children does not negate the fact that Mother's behavior has made it unsafe, and in some instances impossible, for the Children to be in her care. We again reject Mother's attempt to blame the state for her current situation. Father also asserts that the trial court erred in finding that termination of his parental rights to Ke'Andre was in the child's best interest. We disagree. Ke'Andre has virtually no relationship with his Father, and the trial court explained in detail why it would be harmful for the child to ever be placed in his Father's care.

We hold that the trial court properly analyzed the Children's best interest in accordance with Tennessee Code Annotated section 36-1-113(i), and the record supports the findings of the trial court outlined above. We affirm the trial court's holding that there is clear and convincing evidence that it is in the best interest of the Children that Mother's and Father's parental rights be terminated.

## IV. Conclusion

For the foregoing reasons, we reverse the order of the trial court insofar as it found grounds to terminate Mother's parental rights due to failure to provide a suitable home and Father's parental rights for failure to substantial noncompliance with the permanency plan. The remainder of the trial court's order is affirmed, in that other grounds have been proven by clear and convincing evidence to terminate Mother's and Father's rights to the Children, and that it is in the best interest of the Children to do so. Costs of this appeal are taxed equally to the Appellants, Kendra C. and Anthony H. Because Kendra C. and Anthony H. are is proceeding *in forma pauperis* in this appeal, execution may issue for costs, if necessary.

_____
BRANDON O. GIBSON, JUDGE

19